IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

BRENDA LEE SNEED,

                    Plaintiff,                          8:13-CV-50

vs.

CAROLYN W. COLVIN, Acting              MEMORANDUM AND ORDER
Commissioner of the Social Security
Administration,

                    Defendant.

This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Brenda Lee Sneed's application for disability insurance and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq*. The Court has considered the parties' filings and the administrative record. Also before the Court is the Commissioner's motion to strike (filing 32), which asks the Court to strike certain additional medical records filed by Sneed. *See* filing 31 at 8–133. For the reasons discussed below, the Court denies the Commissioner's motion to strike as moot, and remands this case for further proceedings consistent with this Memorandum and Order.

## I. PROCEDURAL BACKGROUND

This case involves two applications made under the Social Security Act. In February 2010, Sneed applied for both disability insurance and supplement income benefits, alleging a disability onset date of August 13, 2008. T65–68, 163–72, 191.[1] Both claims were denied initially and on reconsideration. T65–78. Following a hearing on December 2, 2011, the administrative law judge (ALJ) found that Sneed was not disabled as defined under 42 U.S.C. §§ 416(i), 423(d), or 1382c(a)(3)(A), and therefore not entitled to benefits under the Social Security Act. T6–26.

---

[1] All citations to the administrative record (filings 18 through 18-9) are given as "T [Transcript]" followed by the page number.

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).[2] At step one, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date. *Id.*; *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006). If the claimant has engaged in substantial gainful activity, she will be found not to be disabled; otherwise, at step two, she has the burden to prove she has a medically determinable physical or mental impairment or combination of impairments that significantly limits her physical or mental ability to perform basic work activities. *Gonzales,* 465 F.3d at 894.

At step three, if the claimant shows that her impairment meets or equals a presumptively disabling impairment listed in the regulations, she is automatically found disabled and is entitled to benefits. *Id.* Otherwise, the analysis proceeds to step four, but first, the ALJ must determine the claimant's residual functional capacity (RFC), which is used at steps four and five. 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is what she can do despite the limitations caused by any mental or physical impairments. *Travis v. Astrue,* 477 F.3d 1037, 1041 (8th Cir. 2007). At step four, the claimant has the burden to prove she lacks the RFC to perform her past relevant work. *Gonzales,* 465 F.3d at 894. If the claimant can still do her past relevant work, she will be found not to be disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*

Sneed alleged disability as a result of several impairments, including her overactive bladder, diabetes, and hypothyroidism, as well as depression and anxiety, pain in her back, abdomen, and joints, and diarrhea. T14, 40, 191. But the primary focus of her claim was her overactive bladder. *See* T32, 46–47, 51. According to Sneed, this caused, among other things, a frequent need to urinate, incontinence, pain, and fatigue from waking up several times a night to use the restroom. *See* T18, 43–45.

At step one, the ALJ found that Sneed had not engaged in substantial gainful activity since her alleged onset date of August 13, 2008. T11. At step two, the ALJ found that Sneed had the following medically determinable, severe impairments: overactive bladder, diabetes mellitus, and hypothyroidism. T11. The ALJ found that while Sneed did suffer from

---

[2] The regulations governing disability claims are found at 20 C.F.R. § 404.1501 *et seq.*, while the regulations applicable to claims for supplemental security income benefits are set forth at 20 C.F.R. § 416.901 *et seq.* For present purposes, these parallel regulatory schemes are identical, and the Court will simply refer to the disability regulations.

depression and anxiety, these impairments were not severe. T12–13. At step three, the ALJ found that Sneed's impairments, considered singly and in combination, did not meet or equal a presumptively disabling impairment.

The ALJ determined that Sneed had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), in other words, that she could lift and carry 20 pounds occasionally and 10 pounds frequently, sit for 2 hours in an 8-hour workday, and stand and walk for 6 hours in an 8-hour work day. T13. In doing so, the ALJ found that Sneed's complaints of disabling symptoms, including those related to her overactive bladder, were not credible. T13–18.

At step four, relying upon the testimony of a vocational expert, the ALJ found that Sneed could perform her past relevant work as a sorter and security guard. T19, 54–55. Alternatively, the ALJ went on to find at step five that Sneed could perform other jobs that exist in significant numbers in the national economy, including production assembler, cashier, and housekeeping cleaner. T20–21, 55–56. So, the ALJ concluded that Sneed was not disabled. T21.

On September 17, 2012, the Appeals Council of the Social Security Administration denied Sneed's request for review. T1–4. Sneed's *pro se* complaint (filing 1) seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g).

## II. FACTUAL BACKGROUND

As noted above, Sneed alleged disability as a result of several conditions, including her overactive bladder, diabetes, and hypothyroidism, as well as depression and anxiety, pain in her back, abdomen, and joints, and diarrhea. T14, 40, 191. Sneed does not dispute the ALJ's finding that her depression and anxiety were not severe. Nor does she argue that her diabetes, hypothyroidism, or back or joint pain result in any limitations beyond those contained in the existing RFC.[3] Instead, Sneed's appeal focuses primarily on her bladder condition.

Sneed has been diagnosed with an overactive bladder, as well as urinary frequency and urgency, and urgency incontinence. T255, 300, 468. She claims that she has had an overactive bladder since childhood. T311. In describing her symptoms, Sneed has stated that she has frequent urges to urinate and needs to use the bathroom many times a day, and several times

---

[3] For example, Sneed at one point stated that she could only sit for 15–30 minutes before her legs went numb and she had to go to the bathroom, could only walk about 1 block, and could only stand for 10 to 20 minutes before her back began to hurt and her legs went numb. T204. But Sneed has not objected to the ALJ's finding that she could perform the corresponding physical demands of "light" work, which includes sitting for 2 hours and standing and walking for up to 6 hours.

each night after going to sleep. *See* T43–45, 206, 226, 232, 243, 255–59, 450–54. She also claims that on a typical day she experiences several instances of urinary incontinence, and that protective adult undergarments (both pads and diapers) do not always protect her clothing. *See, e.g.*, T43–45, 401, 454, 468. Sneed explained that, at times, she experiences severe abdominal pain and a bloating feeling, which is only relieved by going to the bathroom. T44, 206.

Sneed testified that her symptoms began to reach their current severity in approximately 2001. T45. Despite this, Sneed worked in a variety of jobs from 2000 to 2008. From 2000 to 2001, she worked in manufacturing as a packer; from 2002 to 2005, she worked as a security guard; and from 2007 to August 2008, she was a driver who transported railroad crews in a van. T43, 210. Additionally, Sneed worked briefly as an item sorter for a thrift store in 2002, and as a valet for 1 month in 2007. T210. Sneed stated that, in her most recent job as a driver, she experienced several instances of incontinence which caused her to soil the van's seat. T43, 226, 530.

The medical records before the Court date back to around 2006. From February to August of that year, Sneed sought treatment for her bladder from Peter M. Gordon, M.D., a surgeon specializing in urology. T259. After conducting a urodynamics study, Gordon diagnosed Sneed with urinary frequency, urgency, and an overactive bladder. T248, 255–58, 300. Gordon prescribed Detrol (tolterodine), a medicine used to treat overactive bladder, followed by a long-acting version of the drug, but Sneed continued to report frequent urination and incontinence. T255, 299. In August, Gordon recommended that Sneed try Vesicare (solifenacin succinate) and directed her to follow up with him in 2 months. T255.

It does not appear that Sneed met with Gordon again. And the medical records do not show that Sneed sought further treatment for her bladder condition until 2011. In the intervening years, however, she continued to report similar urinary symptoms to various providers who were treating her for her diabetes, hypothyroidism, mental health issues, and other conditions, and in her disability paperwork. *See, e.g.*, T203–06, 232, 265. And for at least some of this period, she continued to take Detrol. *See, e.g.*, T194, 242, 309, 329, 361, 369.

In February 2011, Sneed met with Chad LaGrange, M.D., for a urological surgery consultation. T454. She continued to report frequent urination and incontinence, and said that neither Detrol or Vesicare had helped. T255, 454. LaGrange wrote that, at that time, there was "very little" treatment that could be offered other than medications. He switched her Detrol prescription to Toviaz (fesoterodine). T455.

- 4 -

In June 2011, Sneed met with Sheryl McKim, a physician's assistant with the Nebraska Medical Center's Urology Clinic, for further treatment. T452. Sneed reported that neither Toviaz or Detrol had helped, that she was experiencing urinary frequency of 10-20 times per day, urgency and nocturia 4 times per night, and enuresis 2 times a night. She continued to report urge incontinence as well, and claimed she was going through 10 thick pads a day. T452. McKim advised her to begin a voiding diary and provided her with a list of bladder irritants and a video on InterStim surgery.[4] T453.

Sneed met with McKim again in August 2011. As directed, Sneed had been maintaining a voiding diary, which showed continued urinary frequency and incontinence. T468; *see also* T450. After conducting a new urodynamics study, McKim concluded that Sneed suffered from an overactive bladder with urinary urgency and incontinence. T468. McKim started Sneed on a new medication, Ditropan XL (oxybutynin), but concluded that Sneed's best option might be an InterStim or percutaneous tibial nerve stimulation (PTNS), which is another form of neuromodulation therapy. T469. At the hearing before the ALJ in December 2011, Sneed testified that her medical providers were still considering InterStim treatment. T34.

At that hearing, Sneed also testified that she used the bathroom about 13 times a day and 3 times after falling asleep. T44. She estimated she had seven "accidents" a day. T44. Sneed testified that these accidents were such that she had to change not just her undergarments but her outer clothing as well. She testified that this occurred despite using adult diapers and pads, which she had to change several times a day, and that she bathed about three times a day. T45, 49. She estimated that in an 8-hour work day, she would have to use the restroom around eight times. T49. Sneed also testified that she had difficulty concentrating, because often "a signal comes up that says [she] need[s] to go to the restroom." T51. When the ALJ asked how long Sneed's symptoms had been this bad, she answered that it had been at least the last 10 years (so, from about the end of 2001). T45. Finally, Sneed agreed that, although she had other impairments, if it were not for her overactive bladder, she would probably be capable of working. T46–47.

The ALJ also heard testimony from a vocational expert (VE). The VE testified that an individual capable of the full range of light work could perform Sneed's past jobs of sorter and security guard, as well as other jobs

---

[4] "For urge incontinence not responding to behavioral treatments or drugs, stimulation of nerves to the bladder leaving the spine can be effective in some patients. Neuromodulation is the name of this therapy. The FDA has approved a device called InterStim for this purpose." Nat'l Kidney and Urologic Disease Info. Clearinghouse (NKUDIC), *Urinary Incontinence in Women*, http://kidney.niddk.nih.gov/kudiseases/pubs/uiwomen/index.aspx (last updated Sept. 18, 2013).

that existed in significant numbers in the national economy. T54–56. The ALJ also asked whether a person who needed to take eight unscheduled restroom breaks a day would be able to work. The VE testified that such a person would not be able to work, and that "basically, anything other than scheduled breaks is really not allowable in the world of work." T55.

## III. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id*.

## IV. ANALYSIS

Sneed's appeal focuses on her bladder condition, and her symptoms of urinary frequency and incontinence. She argues that the ALJ erred in finding that she was not credible in describing the extent of her symptoms and the effect of those symptoms on her ability to work. Sneed also argues that the ALJ erred in evaluating her complaints of abdominal pain, fatigue, and diarrhea. Filings 21 and 31. The Court finds that, while the ALJ did not err in addressing Sneed's complaints of abdominal pain, fatigue, and diarrhea, the ALJ did not properly evaluate Sneed's complaints of urinary frequency and incontinence. As a result, the ALJ may have erred in determining Sneed's RFC, and her ability to work, and this case must be remanded for further proceedings.

In support of her arguments, Sneed has also submitted additional medical records which were not before the ALJ or the Appeals Council, *see* filing 31 at 9–133, and which the Commissioner has moved to strike. Filing 32. The Court has considered these records, but has not relied upon them in reaching the decision above. These records do not provide an independent basis to remand. That said, at least some of the materials are relevant to Sneed's claim for benefits, and because this case is already being remanded, these materials should be considered by the Commissioner. So, the Commissioner's motion to strike will be denied as moot.

- 6 -

## A. The ALJ's Credibility Determination
### 1. Non-Urological Symptoms

The credibility of a claimant's subjective testimony is primarily for the ALJ to decide. *Vossen v. Astrue,* 612 F.3d 1011, 1017 (8th Cir. 2010). The ALJ's credibility determination will be upheld if the ALJ provides good reasons for discounting the claimant's subjective complaints—such as inconsistencies in the record or the factors set forth in *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)—and those reasons are supported by substantial evidence. *Gonzales,* 465 F.3d at 895–96. While the ALJ did not cite to *Polaski*, she did cite to regulations that contain the same overall standards. *See, e.g.,* T13 (citing 20 C.F.R. § 404.1529). And applying those standards, the ALJ provided good reasons for discounting Sneed's complaints of diarrhea, fatigue, and abdominal pain.

At the hearing, Sneed testified that she was "constantly having diarrhea," but also that she was experiencing it every 3 days. T40, 49. Although her testimony on the matter was not entirely clear, she appeared to be claiming that she was experiencing not only diarrhea—which simply refers to frequent, loose stools—but also bowel incontinence. *See* T48. The ALJ found that these claims were not credible, noting that Sneed's complaints of diarrhea were not supported by the record. T18. The Court finds no error in this conclusion. It does not appear that Sneed ever sought treatment for diarrhea, and Sneed only mentioned it once, at a June 2011 evaluation. She reported only that she had "occasional" diarrhea, and did not claim that this had resulted in any instances of incontinence. T452.

Additionally, Sneed did not explain when these alleged symptoms began. She testified only that she had experienced diarrhea "right after Thanksgiving"—less than a month before the hearing—and a "couple of times" before that. T49. Sneed must prove that her impairments have caused an inability to work that has lasted (or can be expected to last) for a continuous period of at least 12 months, 20 C.F.R. § 404.1505. Even if her testimony is credited, these symptoms were too short-lived to have made a difference to her claim for benefits. Finally, Sneed's argument is inconsistent with her testimony. At the hearing, Sneed acknowledged that her bladder condition was the only thing keeping her from working. T46–47.

Sneed also asserts that the ALJ failed to account for her fatigue, which is the result of waking several times a night to use the restroom, and at times having to change the sheets and clean herself before she can get back to sleep. Filing 21 at 2. Sneed claims that she is "tired all the time" and "never get[s] sleep all night." Filing 21 at 2. The ALJ noted that Sneed alleged she experienced poor energy, but did not incorporate any limitations related to

this in Sneed's RFC. Again, the Court finds no error in this finding, and again, Sneed's complaints are not consistent with the medical records. While Sneed writes that she "never" gets sleep and is tired "all the time," she did not complain of this level of fatigue to her medical providers. And as the ALJ noted, Sneed's providers consistently noted that she was alert and oriented. *See, e.g.*, T15–18, 268, 335, 359, 361, 373, 456. This is not consistent with debilitating fatigue from a chronic lack of sleep. *See Thiele v. Astrue*, 856 F. Supp. 2d 1034, 1047 (D. Minn. 2012).

The ALJ also discussed Sneed's daily activities, and found them to be inconsistent with a severely impaired ability to function on a day-to-day basis. T18. Sneed stated that on a typical day, she woke at 5:00 a.m., prepared simple meals for herself, did one or two loads of laundry, cleaned and swept, and showered two to three times. T18, 47–49, 203–04. She was living in a house that her sister was planning to sell, and so she also helped her sister pack, and unpacked some of her own things. T18, 47. Additionally, Sneed stated that she did not take naps. T204. The ALJ reasonably concluded that Sneed's daily activities were not consistent with severe fatigue. *Cf. Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (claimant's daily activities were inconsistent with complaints of disabling pain).

Finally, Sneed asserts that she experiences severe abdominal pain. It appears that Sneed is referring to pain that she experiences when she feels the urge to urinate. In her disability reports and at the hearing, she claimed to experience severe pain when she had to resist the urge to urinate, and that this pain was relieved by going to the bathroom. *See* T44, 206, 226. It does not appear, however, that this pain results in any limitations beyond those caused by Sneed's other bladder symptoms, such as urinary frequency, urgency, and incontinence. In other words, the same revision to her RFC that would accommodate her other claimed bladder symptoms—some amount of additional bathroom breaks—would also seem to account for the related pain. So, the Court will consider Sneed's allegations of pain together with her other bladder symptoms, below.

In sum, the ALJ did not err in finding that Sneed was not credible in her complaints of diarrhea and fatigue. The ALJ's findings were adequately explained and supported by the record. *See Choate v. Barnhart*, 457 F.3d 865, 871 (8th Cir. 2006). However, the Court cannot say the same for the ALJ's treatment of Sneed's allegations of urinary frequency, urgency (and pain), and incontinence.

## 2. Urological Symptoms

The ALJ found, employing a bit of Social Security boilerplate, that Sneed's "medically determinable impairments could reasonably be expected

to cause the alleged symptoms;" but that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with" the RFC that the ALJ had formulated. T14. That RFC did not include a single limitation related to Sneed's bladder condition. T13. The ALJ did not find, for example, that Sneed might require one or two additional bathroom breaks a day. So, it appears that the ALJ found that Sneed was not at all credible in her complaints of urinary frequency, urgency, pain, and incontinence.

As noted above, Sneed testified at the hearing that she frequently had to use the bathroom (about 13 times a day and 3 times each night), and estimated that in an 8-hour work day, she would need to use the restroom about 8 times. T44, 49. These numbers were generally consistent with her reports from 2006 through 2011. *See, e.g.*, T255, 257, 259, 450, 452, 454. But Sneed also testified that she was having seven accidents a day, of such severity that she had to change her outer clothing. T44–45. The ALJ specifically found this to not be credible, reasoning that "the use of Poise/Depends should prevent soiling of her outer clothes." T18. The Court agrees on this limited point—it is hard to believe that Sneed was having this degree of leakage if she was using diapers (as opposed to pads), and given that she was generally at home, where she could use the bathroom and change as needed.[5] More importantly, at no other point in the many medical records or disability questionnaires did Sneed ever report such severe symptoms.

But that does not mean that Sneed was not experiencing the frequent need to urinate, as well as *some* incontinence. She consistently reported as much, and her medical providers agreed that she suffered from an overactive bladder. And while the ALJ provided several other reasons for finding that Sneed was not credible in her testimony regarding her bladder symptoms—frequency, urgency, pain, and some degree of incontinence—the ALJ did not provide good reasons.

First, the ALJ reviewed Sneed's daily activities and concluded that "[t]he record does not indicate the quality of the claimant's daily functioning has been affected as severely as she has alleged." T18. That may have been true with regard to Sneed's allegations of disabling joint pain and fatigue. But nothing about Sneed's daily activities—such as doing laundry and a little cleaning, making meals for herself, or occasionally walking around the block

---

[5] However, Sneed's testimony on this point is somewhat ambiguous. She testified that she utilized both pads and diapers. T45. And it is certainly credible that a pad might fail where a diaper would not. But the ALJ did not seek clarification on this point (and actually appears to have cut Sneed off in the middle of her answer). T45.

or visiting close family—were inconsistent with the need to use the bathroom frequently. Rather, Sneed's activities show that she generally tried to stay home, where she could use the bathroom and change clothes as needed.

Second, the ALJ wrote that Sneed's "prescribed medications provide adequate, if not total relief, when taken as directed." T18. Once more, the ALJ's opinion does not distinguish between Sneed's different medical conditions. The record does show that Sneed's diabetes and hypothyroidism were controlled with medication. But the same cannot be said for Sneed's bladder condition. Instead, the record shows that Sneed tried many medications and consistently reported that each had failed to control her symptoms. And by 2011, her medical providers were considering more serious forms of treatment, such as a surgical implant.

The only basis for finding that Sneed's bladder condition was controlled by medication comes from the opinion of Nicole L. Anderson, M.D., who examined Sneed once in October 2009. *See* T311–17. After a brief physical examination, Anderson concluded that Sneed's urinary urgency and frequency were controlled with medication. T317. But Anderson provided no explanation for this finding, and performed no tests or examinations that would have supported this conclusion. Additionally, Anderson's opinion was rendered without an opportunity to review Sneed's more recent urological records, which confirmed the presence of urinary frequency, urgency, and incontinence. Anderson's single and unsupported opinion—which the ALJ did not cite—does not provide substantial evidence for the ALJ's conclusion.

Third, the ALJ observed that there were no opinions from treating or examining physicians that Sneed was disabled or had significant functional limitations. T18. But this is not very persuasive, as the record also fails to show that Sneed's physicians were ever asked to provide such opinions. *See Whitman v. Colvin*, ___ F.3d ___, 2014 WL 3896131 (8th Cir. Aug. 7, 2014). And the opinions of the examining physicians (who each saw Sneed once) are not particularly helpful. The Court has already discussed the shortcomings in Anderson's opinion.

In addition to Anderson, Sneed underwent a consultative examination by Paul Kolkman, M.D., in April 2010. T368. Like Anderson, Kolkman declined to render an opinion as to whether Sneed was disabled. T317, 374. And in any event, Kolkman did not perform any tests or examinations that would provide him with a basis to opine on Sneed's bladder condition. Instead, he wrote, "I would refer to the claimant's previous urologic visits for any possible test showing stress or urge incontinence." T374. But like Anderson, Kolkman rendered his opinion before Sneed's 2011 urodynamics study, which McKim interpreted as demonstrating urge incontinence. T468.

- 10 -

Fourth, the ALJ observed that there were no recommendations that Sneed seek further treatment. T18. This observation might be correct in a literal sense, but it overlooks a significant point. In 2011, after noting that Sneed reported no success with a variety of medicines, McKim concluded that Sneed's "best option" might be an InterStim or PTNS. T469. However, the ALJ's opinion contains no discussion of Sneed's visits to LaGrange or McKim in 2011. This omission stands out against the ALJ's otherwise thorough summary of Sneed's medical records. *See* T15–19.

Finally, the ALJ observed that the "objective findings also fail to show the claimant's symptoms are as limiting as she has alleged." T18. Once more, this observation is true when it comes to Sneed's other claimed symptoms, such as joint pain and diarrhea. But when it comes to Sneed's bladder condition, it is not clear what further objective findings would have satisfied the ALJ. And while a lack of objective medical evidence is relevant to a claimant's credibility, it cannot serve as the sole basis for discounting a claimant's subjective complaints. *See Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010).

This is not to say that the ALJ necessarily erred in finding that Sneed was not credible. The ALJ properly decided not to credit many of Sneed's other complaints. And the ALJ could have found that Sneed was generally not credible.[6] But if the ALJ made such a finding, she did not set it forth in her written opinion. Similarly, the ALJ could have relied upon her observations of Sneed's demeanor at the hearing—which would have been entirely proper. *See Johnson v. Apfel*, 240 F.3d 1145, 1147–48 (8th Cir. 2001). But the ALJ's opinion does not address this. And the reasons that the ALJ *did* provide were not persuasive and were not supported by the record.

The Court has carefully considered the record and finds that it generally supports Sneed's testimony regarding her symptoms—if not necessarily their severity. And the Court cannot say that the record weighs so heavily against Sneed's credibility that the ALJ would necessarily have disbelieved her, were it not for the erroneous reasoning that informed the ALJ's decision. *See, e.g.*, *Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008).

 If the ALJ had credited Sneed's testimony regarding her bladder condition—even partially—then the outcome of this case may have been different. The VE testified that "basically, anything other than scheduled

---

[6] The problem is not even necessarily one of veracity. As one Social Security employee observed, Sneed has, at times, been a "very poor historian." T188. She has presented a confusing and vague account of her symptoms. For example, in one questionnaire, she wrote that her medications did not relieve her symptoms, but on the very next page, that they did. T205–06.

[restroom] breaks is really not allowable in the world of work." T55. In other words, if the ALJ had found that Sneed needed even one unscheduled break a day, then according to the VE, she would not have been capable of working. On remand, further testimony from a VE may establish that there are, in fact, other jobs that could accommodate Sneed's condition. But the Court is limited to the record that exists at this time, and cannot substitute its own judgment for the expertise of a VE. In any event, it is not implausible that, among the jobs the ALJ found Sneed was capable of performing—such as security guard and production assembler—unscheduled bathroom breaks would be something of a rarity.

One more matter merits further discussion. Sneed's prior work record would seem to suggest that she is capable of maintaining employment, despite her bladder condition. After all, Sneed testified that her bladder symptoms have been at their current severity since approximately 2001, yet she has held several jobs since then. There are two problems, however, with using Sneed's work record as a basis for affirming the ALJ's decision.

First, this reasoning does not appear in the ALJ's opinion, and "'[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.'" *Mouawad v. Gonzalez,* 485 F.3d 405, 413 (8th Cir. 2007) (quoting *SEC v. Chenery Corp.,* 318 U.S. 80, 87 (1943)). Under the *Chenery* doctrine, a reviewing court may not uphold an agency decision based on reasons not articulated by the agency, when the agency has failed to make a necessary determination of fact or policy upon which the court's alternative basis is premised. *Banks v. Massanari,* 258 F.3d 820, 824 (8th Cir. 2001). In other words, it is not enough that the record appears to contain reasons to discredit the claimant's testimony. Rather, the ALJ must, in the first instance, make express credibility determinations and set forth the reasons in the record which cause the ALJ to reject the claimant's complaints. *See Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir. 2004).

Second, *Chenery* problems aside, the record is undeveloped when it comes to the actual nature of Sneed's prior work, and too many questions remain for the Court to comfortably conclude that Sneed's prior work is inconsistent with her claim of disability. The prior work record submitted by Sneed includes five jobs, only two of which are potentially significant. Her earliest position, in manufacturing, ended in 2001, just before she testified her symptoms were reaching their current severity. T210. And Sneed's prior work as an item sorter and valet lasted very briefly, and it is unlikely that

- 12 -

these jobs qualify as "substantial gainful activity."[7] *See* T178–79, 193. That leaves Sneed's work as a security guard, from 2002 to 2005, and as a driver, from 2007 to 2008. T210.

Sneed claims that when she worked as a security guard, she had to hold her urge to urinate and would get side aches, and that she also became dehydrated (presumably from drinking less water), which caused her to develop kidney stones. And, in fact, the record does suggest that, in 2005, Sneed developed a kidney stone. *See* T249. Sneed's claim is plausible, as dehydration can lead to kidney stones. *See* NKUDIC, *Kidney Stones: What You Need to Know*, http://kidney.niddk.nih.gov/KUDiseases/pubs/stones_ES/ (last updated Sept. 25, 2013). These claimed difficulties do not necessarily show that Sneed was unable to continue working. She did hold the job for 3 years. And she has not explained why she left the job, let alone demonstrated that she was fired or was performing unsatisfactorily.[8] But this does suggest that further inquiry may be necessary.

Similarly, the existing record does not clearly describe the actual demands of Sneed's most recent work, as a driver. The job involved transporting railroad crews in a van. T36. But Sneed was not necessarily driving that often. Sneed testified briefly that she "shared the van" with her sister, and that her sister "mostly had the van." T36. Sneed also wrote, on a form describing the job, that it involved sitting at home on-call. T211. Presumably, when she was at home, Sneed could use the bathroom as she needed. And Sneed testified that, when she was driving, she soiled the van's seat on several occasions. *See* T43, 226, 530. While Sneed did not testify that she was fired or disciplined, this hardly shows that she is capable of working

---

[7] As the phrase implies, substantial gainful activity (SGA) must be gainful, that is, done for pay or profit, even if a profit is not realized. 20 C.F.R. § 404.1572. Ordinarily, a claimant's earnings alone will demonstrate whether the claimant has engaged in SGA. 20 C.F.R. § 404.1574. If a claimant's monthly earnings fall below a set dollar amount (which is adjusted for national wage growth each year), the claimant will generally be considered not to have engaged in SGA, unless other information shows otherwise. 20 C.F.R. § 404.1574(b)(2)–(3). Sneed's earnings from the sorter and valet jobs appear to have fallen short of these amounts. T178–79; Social Security Administration, *Substantial Gainful Activity*, https://www.socialsecurity.gov/oact/cola/sga.html (last visited Aug. 29, 2014). And there is no other information to suggest these positions should be considered SGA.

[8] Sneed asserts for the first time in her brief that she has "tried to work and been let go." Filing 21 at 2. But she does not specify which job or jobs she is referring to. The Court declines to give this statement any weight for two reasons. First, Sneed has not sworn to the truth of this statement. Second, the Court may not consider evidence outside the record that was before the Commissioner, and Sneed has not previously made this claim in the administrative record. 42 U.S.C. § 405(g); *Delrosa v. Sullivan*, 922 F.2d 480, 483–84 (8th Cir. 1991).

a job without frequent access to a bathroom. Given all of these missing details, the Court hesitates to conclude that Sneed's prior work shows she is not disabled. In any event, that question is not before the Court at this time, as the ALJ did not base her decision on Sneed's prior work.

This is not to imply that the ALJ erred by failing to further develop the record regarding Sneed's prior work. It was Sneed's responsibility to present the strongest possible case for benefits, and the details of her prior work are something she could have provided. *See Mouser v. Astrue*, 545 F.3d 634, 637 (8th Cir. 2008). On remand, however, the Commissioner should exercise caution in relying upon Sneed's prior work record, without first considering the questions raised above. While it was Sneed's burden to press her case, Social Security proceedings are non-adversarial, and the ALJ has an independent duty to develop the record. *See Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994). That duty flows from the overarching objective of the Social Security Administration: to see to it that deserving claimants who apply for benefits receive justice. *Id.* If, on remand, the Commissioner wishes to rely upon Sneed's prior record as a basis for denying benefits, the record must be better developed.

In sum, the Court finds that this case must be remanded for further proceedings, so that Sneed's credibility may be properly evaluated.

## B. SNEED'S ADDITIONAL EVIDENCE

Sneed has submitted a number of additional medical records, which she has asked the Court to consider. *See* filing 31 at 8–133. However, the Social Security Act generally bars the Court from considering evidence that was not part of the record before the Commissioner. 42 U.S.C. § 405(g); *Delrosa*, 922 F.2d at 483–84. Instead, the Court may remand a case to have additional evidence taken, but only upon a showing that "there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). So, the Court will construe Sneed's submission as a request to remand for consideration of the additional materials.

To be considered material, the new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied. *Hepp v. Astrue*, 511 F.3d 798, 808 (8th Cir. 2008). Furthermore, it must be reasonably likely that the Commissioner's consideration of this new evidence would have resulted in an award of benefits. *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997).

The additional records that Sneed has submitted do not appear to be in any particular order, and Sneed has not pointed the Court to any specific portions that would support her arguments. Many of the records are

- 14 -

duplicates of materials that are already in the administrative record. *See, e.g.*, filing 31 at 14–49. Others, such as a series of laboratory results, have no apparent significance. *See, e.g.*, filing 31 at 120–26, 132–33.

There are a handful of records which are relevant and new. Among these are several treatment notes from October 2011 to January 2012. Filing 31 at 100–03. In an October visit to McKim, Sneed reported that the most recent medication she had tried, oxybutynin, had not worked, and had caused intermittent diarrhea. T101. McKim concluded that Sneed might suffer from a urethral diverticulum or interstitial cystitis, and scheduled an MRI and bladder hydrodistention to test these hypotheses. McKim also noted that if Sneed did have a diverticulum, treatment with an InterStim might not be an option. T101.

The MRI was negative for a diverticulum. Filing 31 at 54. A new provider, Eugene Park, M.D., conducted the hydrodistention. Among other things, Park found that Sneed might have had mild interstitial cystitis.[9] T102–03.

The January 2012 record is from a visit to McKim, in which Sneed continued to report incontinence. T103. However, the note cuts off in the middle, without providing any useful observations by McKim. T103.

These records are relevant and probative of Sneed's condition for the period under consideration. Nonetheless, they are not material, as it is not likely that the Commissioner's consideration of these records would have resulted in an award of benefits. With the exception of the possible diagnosis of interstitial cystitis, these records merely confirm what previous records have shown: that Sneed has incontinence, that medicines have failed, and that her providers were considering other treatments. More importantly, these records do not provide what was missing in the existing record. They do not contain objective verification that Sneed's symptoms were as prevalent as she alleged, and they do not contain opinions about Sneed's ability to work. The mere presence of a new (and tentative) diagnosis would not have changed the outcome of the case.

Sneed has also failed to show good cause for failing to submit these materials sooner. Good cause does not exist when the claimant had the opportunity to obtain the new evidence before the administrative record closed but failed to do so without providing a sufficient explanation. *Id.* The hearing in this case—at which Sneed submitted other new records—occurred

---

[9] Interstitial cystitis "is a condition that causes discomfort or pain in the bladder and a need to urinate frequently and urgently." U.S. Nat'l Library of Med., MedlinePlus, *Interstitial Cystitis*, http://www.nlm.nih.gov/medlineplus/interstitialcystitis.html (last visited August 29, 2014).

on December 2, 2011. The majority of these records existed prior to that date. And Sneed could have waited before requesting review by the Appeals Council, so that she could have included the remainder of the records, from January 2012, in her request for review.[10] But Sneed did not to do so.

Sneed has submitted one other record which bears noting: a one-page form from the Douglas County Department of General Assistance, completed in May 2012, by Francisco Machuca, M.D. Filing 31 at 8. Machuca stated that, due to her diagnoses of diabetes, hypothyroidism, urinary incontinence, and depression, Sneed could not work. Machuca noted that Sneed had been dealing with elevated blood sugars and diarrhea. He also stated that these diagnoses prevented her from making it to a bus stop. Finally, Machuca checked a box stating that Sneed's anticipated length of disability was 6 months. But this was then crossed out, and under "other [length of disability]" a question mark was written. Filing 31 at 8.

Again, Sneed has failed to show good cause for not obtaining this opinion in a timely fashion. While good cause may be established where the medical condition and associated records did not exist prior to the close of the administrative proceedings, here it appears to be only the associated records that were lacking. *Mouser*, 545 F.3d at 637. Sneed has not explained why she could not have obtained a similar opinion at an earlier date.

Even if Sneed had shown good cause, the note from Machuca is not material, as it is not reasonably likely that consideration of the note would have resulted in an award of benefits. The amount of weight given to a medical opinion is to be governed by a number of factors, such as the nature and extent of the provider's treatment relationship with the claimant, whether the opinion is supported with evidence such as medical signs and laboratory findings, whether the opinion is adequately explained, and the provider's medical specialty. 20 C.F.R. § 404.1527. The note under consideration is a conclusory opinion with no supporting basis. It fails to state how long Machuca expected Sneed's disability to last; it contains no explanation for Machuca's findings; and there is no evidence that Machuca ever treated, examined, or even met with Sneed. Machuca's conclusion that Sneed could not even make it to the bus stop is not supported by the record. Finally, the note does not explain the standards that the County uses to

---

[10] The ALJ's decision was issued on December 16, 2011, and Sneed was presumed to have received notice of the decision within 5 days. T6. Sneed therefore had until mid-February 2012 to request review by the Appeals Council. 20 C.F.R. § 404.968(a)(1). The Appeals Council may consider new evidence, but it must be submitted along with the request for review. 20 C.F.R. §§ 404.968(a) and 404.970(b). Sneed was informed of this, as well as her right to request an extension, 20 C.F.R. § 404.968(b), but elected not to request an extension or submit any additional materials. T4–7.

determine disability. Those standards may or may not resemble those used to determine disability under the Social Security Act. The Court has no trouble concluding that the ALJ would have accorded this opinion very little, if any, weight.

In sum, Sneed's additional evidence does not present an independent basis for remand. That said, because some of the materials are relevant, and because this case is already being remanded for further proceedings, the Commissioner should consider the additional materials. Therefore, the Court will deny the Commissioner's motion to strike as moot.

## V. CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ did not properly evaluate Sneed's credibility. The case will be remanded for further proceedings consistent with this opinion. The Commissioner should consider the additional evidence submitted by Sneed, and should also consider whether it is necessary to further develop other aspects of the record, as set forth above.

The Court recognizes that, to date, Sneed has had difficulty obtaining (and retaining) counsel. *See, e.g.*, T29–30, 134. It is worth noting that there are local organizations that may be able to offer Sneed legal advice or assistance with her case.[11]

THEREFORE, IT IS ORDERED:

1.     The Commissioner's motion to strike (filing 32) is denied as moot.

2.     This case is reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

3.     A separate judgment will be entered.

---

[11] These include organizations such as the Nebraska State Bar Association or Legal Aid of Nebraska. The contact information for these and other organizations can be found in this Court's publication, *Filing Your Lawsuit in the District of Nebraska: A Guide to Self Representation for Non-Prisoners* 29–31, http://www.ned.uscourts.gov/internetDocs/prose/Pro%20Se%20Guide.pdf (February 2011), the relevant pages of which are attached to this Memorandum and Order.

Dated this 29th day of August, 2014.

BY THE COURT:

John M. Gerrard
United States District Judge

# United States District Court
# District of Nebraska

February 2011

## Filing Your Lawsuit in the District of Nebraska:
## A Guide to Self Representation for Non-Prisoners

Disclaimer: The contents of this Guide are provided for informational purposes only and do not constitute legal advice. If you are in a prison or a jail, or your suit is related to your incarceration, this Guide should *not* be used.

# Introduction

Congress organized the United States District Court for the District of Nebraska ("the Court") as one judicial district on March 25, 1867. At that time, Congress assigned the Court to the Eighth Circuit, where it remains today. The Court operates from three locations – Omaha, Lincoln, and North Platte. The Omaha office has two active district judges, one senior-status judge, and two full-time magistrate judges. The Lincoln office has one active district judge, one senior-status judge, and one full-time magistrate judge. The Lincoln and Omaha offices have a fully-staffed office for the Clerk of the District Court. The North Platte office is unstaffed. Judges sit in the North Platte office on a rotating basis periodically.

This Guide has been prepared for individuals who choose to file a lawsuit in the Court without an attorney ("pro se") and who are not incarcerated. The Court would like to acknowledge and thank the District of Kansas, which has an excellent pro se guide that served as a model for creating this Guide.

The Court takes pro se cases seriously and its goal is to resolve them quickly and fairly. The Guide has been prepared with this goal in mind. It is intended as an informative and practical resource and guide to understanding the basic practices, rules, and procedures of the Court. A glossary that explains some of the words used in this Guide is included in Part 6.

The statements and materials presented in this Guide are for educational purposes only and do not constitute legal advice. This Guide is not intended to be a substitute for the advice and assistance of a licensed attorney. In addition, you should keep in mind that the law is constantly changing and the information contained in these pages may not be complete or up-to-date. The laws and rules to which this Guide refers may have changed since the Guide's publication, and new laws or rules may apply to your case. You are responsible for the accuracy of any information on which you rely.

**A PRO SE GUIDE**

# PART

# 5

## Resources That May Help You

### Where can you get legal advice?

If you cannot pay an attorney, but need legal advice, there are a number of agencies that may be able to help you.  The following list is not exhaustive, but these agencies and libraries may help you with your case.  You should contact these agencies to determine whether they can help you.

NEBRASKA STATE BAR ASSOCIATION
635 South 14th Street
P. O. Box 81809
Lincoln, NE 68508
(402) 475-7091

LINCOLN BAR ASSOCIATION
c/o DeMars Gordon Olson & Zalewski
134 South 13th Street, Suite 800
Lincoln, NE 68508
(402) 438-2500

OMAHA BAR ASSOCIATION
P. O. Box 11195
Omaha, NE 68111-1095
(402) 280-3603

UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
131 M Street Northeast
Washington, DC 20507
(202) 663-4900

**A PRO SE GUIDE**

(800) 669-4000
(TTY) 1-800-669-6820

NEBRASKA EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Lincoln (Main) Office:
Nebraska State Office Building
301 Centennial Mall South, 5th Floor
P. O. Box 94934
Lincoln, NE 68509-4934
(402) 471-2024
Toll Free Number 1-800-642-6112

Omaha Office:
Downtown Education Center/State Office Building
1313 Farnam Street, 3rd Floor
Omaha, NE 68102-1836
(402) 595-2028
Toll Free Number 1-800-382-7820

Scottsbluff Office:
Panhandle State Office Complex
4500 Avenue "I"
P. O. Box 1500
Scottsbluff, NE 69363-1500
(308) 632-1340

ACLU-NEBRASKA
941 "O" Street, Suite 706
Lincoln, NE 68508
(402) 476-8091

LEGAL AID OF NEBRASKA
Bancroft Office:
415 Main St.
Bancroft, NE 68004
(402) 648-3457

Grand Island Office:
207 W. 3rd St.
Grand Island, NE 68801
(308) 381-0517

Lincoln Office:

**Page 30**

**A PRO SE GUIDE**

941 O St. Ste. 825
Lincoln, NE 68508
(402) 435-2161

Norfolk Office:
214 N. 7th St.
Norfolk, NE 68701
(402) 644-4761

North Platte Office:
102 E. 3rd St. Ste. 102
North Platte, NE 69101
(308) 532-6793

Omaha Office:
1904 Farnam St., 5th Flr.
Omaha, NE 68102
(402) 348-1069

Scottsbluff Office:
1423 1st Ave.
Scottsbluff, NE 69363
(308) 632-4734

## Where can you do legal research?

UNIVERSITY OF NEBRASKA COLLEGE OF LAW
1875 North 42nd Street
Lincoln, NE 68583

CREIGHTON UNIVERSITY SCHOOL OF LAW
2500 California Plaza
Omaha, NE 68178

EIGHTH CIRCUIT COURT OF APPEALS LIBRARY, LINCOLN
437 Federal Building
100 Centennial Mall North
Lincoln, NE 68508-3803
(402) 437-1610

EIGHTH CIRCUIT COURT OF APPEALS LIBRARY, OMAHA
Roman L. Hruska Courthouse

**Page 31**

**A PRO SE GUIDE**

111 South 18th Plaza, Suite 4104
Omaha, NE 68102-1322
(402) 661-7590